1  **KESSLER TOPAZ**
    **MELTZER & CHECK, LLP**
2  STACEY M. KAPLAN (Bar No. 241989)
    skaplan@ktmc.com
3  One Sansome Street, Suite 1850
    San Francisco, CA 94104
4  Telephone: (415) 400-3000
    Facsimile: (415) 400-3001
5
    *Counsel for Plaintiff Lisa Marie Barsuli*
6

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA MARIE BARSULI, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:24-cv-3282 |
| Plaintiff, | CLASS ACTION |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| GOODRX HOLDINGS, INC., DOUGLAS HIRSCH, TREVOR BEZDEK, and KARSTEN VOERMANN, | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff Lisa Marie Barsuli ("Plaintiff"), by and through Plaintiff's counsel, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of regulatory filings made by GoodRx Holdings, Inc. ("GoodRx" or the "Company") with the United States Securities and Exchange Commission (the "SEC"), press releases, presentations, and media reports issued by and disseminated by the Company, analyst and media reports concerning the Company, and other public information regarding the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I. **NATURE OF THE ACTION AND OVERVIEW**

1. This is a federal securities class action on behalf of a class of all persons and entities that purchased or otherwise acquired GoodRx common stock between September 23, 2020, and November 8, 2022, inclusive (the "Class Period"). The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder, and are alleged against GoodRx and certain of the Company's senior executives, including Douglas Hirsch (the Company's Co-Chief Executive Officer during the Class Period), Trevor Bezdek (the Company's Co-Chief Executive Officer during the Class Period), and Karsten Voermann (the Company's Chief Financial Officer) (collectively, "Defendants").

2. GoodRx is a Delaware corporation with principal executive offices in Santa Monica, California. GoodRx operates a price comparison platform for prescription drugs which, in many cases, offers consumers access to lower prices (through discount codes and coupons) for their medications. GoodRx generates most of its revenue from contracts with pharmacy benefit managers ("PBMs") who agree to pay GoodRx a commission on prescription drug purchases made by consumers who

use GoodRx's discount codes and coupons at participating pharmacies. GoodRx also generates a portion of its revenue from subscription plans like the "Kroger Rx Savings Club," which provides "access [to] lower prescription prices at" pharmacies operated by The Kroger Co. ("Kroger"). GoodRx's common stock trades in the United States on The Nasdaq Stock Market LLC ("Nasdaq") under the ticker symbol "GDRX."

3. In connection with GoodRx's initial public offering ("IPO") on September 23, 2020, and throughout the remainder of the Class Period, Defendants continuously touted the Company's strong relationships with pharmacies as a significant element of its business plan. Among other things, GoodRx repeatedly highlighted the Kroger Rx Savings Club—which provides "access [to] lower prescription prices at Kroger pharmacies, including over 100 common generic medications for free, $3.00, or $6.00 price points, and savings on more than 1,000 other generic medications." Critically, however, Defendants never informed investors of the material risk that Kroger, which accounted for nearly 25% of GoodRx's prescription transactions revenue, could unilaterally refuse to accept GoodRx's discounts.

4. Investors began to learn the truth about the risks of GoodRx's over-dependence on Kroger (including the risk that, notwithstanding the Kroger Rx Savings Club, Kroger could unilaterally refuse to accept GoodRx's discounts) on May 9, 2022, when GoodRx revealed that, late in the first quarter of 2022, "a grocery chain had taken actions that impacted acceptance of discounts from most PBMs for a subset of drugs" and that this "impacted the acceptance of many PBM discounts for certain drugs at this grocer's stores." GoodRx further acknowledged that this disruption "could have an estimated revenue impact of roughly $30 million" in the second quarter of 2022—resulting in the Company announcing disappointing second quarter 2022 revenue guidance of only about $190 million.

5. In the accompanying investor earnings call held that same day, Defendant Bezdek admitted that the use of GoodRx discounts at the "grocery chain" were

responsible for nearly 25% of GoodRx's prescription transactions revenue. While Defendants refused to identify the grocer by name, analysts and media outlets quickly recognized that the unnamed grocery chain was Kroger.

6.  On this news, the price of GoodRx common stock plummeted $2.78 per share, or more than 25%, from a close of $10.75 per share on May 9, 2022, to close at $7.97 per share on May 10, 2022.

7.  On November 8, 2022, Defendants provided further information on the severity of the revenue impact from the Kroger disruption—with the Company estimating that the "impact of the grocer issue on third quarter [prescription transactions revenue] was approximately $40 million" and that the Company expected "a combined $45 million to $50 million estimated impact to prescription transactions revenue" for the fourth quarter of 2022. Defendants further acknowledged that the Company was seeking to enter into contractual relationships with pharmacies to prevent similar disruptions from occurring in the future.

8.  On this news, the price of GoodRx common stock declined an additional $1.18 per share, or more than 22%, from a close of $5.24 per share on November 8, 2022, to close at $4.06 per share on November 9, 2022.

9.  This Complaint alleges that, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose that: (1) while Kroger accounted for less than 5% of the pharmacies accepting GoodRx discounts, Kroger was responsible for nearly 25% of GoodRx's total prescription transactions revenue (the Company's primary revenue stream); and (2) Kroger could unilaterally cease accepting GoodRx discounts, cutting off some or all of GoodRx's revenues for purchases at Kroger's pharmacies; and (3) as a result, Defendants' representations about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

10. As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's common stock when the truth was revealed, Plaintiff and other members of the class have suffered significant damages.

**II.     JURISDICTION AND VENUE**

11. Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

12. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). GoodRx maintains its headquarters in Santa Monica, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.

14. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

**III.    PARTIES**

15. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased shares of GoodRx common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

16. Defendant GoodRx is a Delaware corporation headquartered at 2701 Olympic Boulevard, Santa Monica, California, 90404.

17. During the Class Period, Defendant Hirsch was GoodRx's Co-Chief Executive Officer and a Company Director. Defendant Hirsch currently serves as the Company's Chief Mission Officer and as a Company Director.

18. During the Class Period, Defendant Bezdek was GoodRx's Co-Chief Executive Officer and a Company Director. Defendant Bezdek currently serves as the Company's Chairman and as a Company Director.

19. During the Class Period, Defendant Voermann was GoodRx's Chief Financial Officer. Defendant Voermann currently serves as the Company's Chief Financial Officer.

20. Defendants Hirsch, Bezdek, and Voermann are collectively referred to as the "Individual Defendants."

21. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of GoodRx's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

22. GoodRx and the Individual Defendants are collectively referred to herein as "Defendants."

IV. **SUBSTANTIVE ALLEGATIONS**

A. **Background**

23. GoodRx operates a price comparison platform for prescription medicines, processing billions of data points every day. Consumers can access GoodRx's price

comparison platform though its website and apps that can be used on computers, cell phones, and other electronic devices. Central to GoodRx's business model is its ability to offer consumers reduced prices for medicines at pharmacies that have agreed to accept the discounts offered by GoodRx. GoodRx claims that, in many cases, the discounted prices it offers consumers are lower than their insurance co-pays.

24. GoodRx generates most of its revenue from contracts with PBMs who agree to pay GoodRx a commission on prescription drug purchases made by consumers who use GoodRx's discount codes and coupons at participating pharmacies. The Company's revenue model works as follows. PBMs negotiate with pharmacies to determine a discounted, negotiated rate for prescription drugs that consumers will pay at the pharmacy. GoodRx then advertises and issues codes and coupons to consumers redeemable for this discounted rate. When a transaction occurs in which a consumer fills a prescription using a GoodRx code or coupon, the PBM receives a portion of the price that the consumer paid to the pharmacy. GoodRx then receives a percentage of this amount or a fixed payment from the PBM as compensation for directing the consumer to that PBM's pricing and the pharmacy.

25. GoodRx also generates a portion of its revenue from subscription plans like the Kroger Rx Savings Club. Subscribers pay an annual upfront fee for a subscription that provides access to lower prices on prescriptions at Kroger pharmacies. At the commencement of the subscription term, subscribers pay an annual fee to GoodRx which the Company shares with Kroger. GoodRx also generates revenue from the prescriptions purchased at Kroger.

26. The Company's common stock trades on the Nasdaq under the ticker symbol "GDRX."

### B. Defendants' Materially False and Misleading Statements Cause Substantial Losses to Investors

27. The Class Period begins on September 23, 2020, to coincide with GoodRx's IPO. In the IPO prospectus filed on September 22, 2020, the Company

touted as one of its main strengths the widespread and diversified acceptance of GoodRx discounts, stating that "[c]onsumers can use GoodRx at over 70,000 pharmacies, nearly every retail pharmacy in the United States," and that the Company's "proprietary technology platform . . . can be used to save money at every major retail pharmacy."

28. GoodRx also highlighted the Kroger Rx Savings Club—which provides "access [to] lower prescription prices at Kroger pharmacies, including over 100 common generic medications for free, $3.00, or $6.00 price points, and savings on more than 1,000 other generic medications." The Company failed to disclose, however, its significant dependence on a single pharmacy chain—Kroger—and that, notwithstanding GoodRx's contractual agreement with Kroger forming the Kroger Rx Savings Club, Kroger could unilaterally refuse to accept GoodRx's discounts.

29. In a series of ensuing industry conferences, Defendants touted the Company's strong, long-lasting relationships with pharmacies, but failed to disclose pharmacies' ability to unilaterally stop accepting GoodRx discounts. For example, at the RBC Global Technology, Internet, Media and Telecommunications Conference (Virtual) on November 18, 2020, when discussing the Company's relationships with pharmacies, Defendant Hirsch stated that GoodRx had close business relationships with pharmacies "to the point where [the Company was] talking almost daily with [them]," and Defendant Voermann likewise explained that "pharmacies are our friends. . . . and we see that continuing far into the future."

30. Defendants also assured investors that the Company's relationships with pharmacies were strong because pharmacies could not set or advertise lower prices, while GoodRx, acting with PBMs, could. For example, at the Credit Suisse Technology Conference (Virtual) on December 3, 2020, Defendant Hirsch explained that, "I know this is really hard for people to get through their head, but pharmacies cannot set their own prices without getting in a lot of trouble. . . . they cannot just wake up tomorrow and go, we're going to make every drug X dollars."

31. As Defendant Hirsch reiterated a few days later at the UBS Global TMT Conference (Virtual) on December 8, 2020, pharmacies were dependent on GoodRx to set rates. To this end, Defendant Hirsch emphasized that GoodRx "help[s] PBMs . . . and pharmacies make money" because "[t]hey use us as a way to drive prices because they can't do it themselves."

32. In connection with its annual report for 2020 filed with the SEC on March 11, 2021, GoodRx again touted the Kroger Rx Savings Club, explaining that its "subscription offerings are a natural extension of our successful prescription offering" and "leverage[s] our relationships across the healthcare ecosystem and our product expertise to provide subscribers with even greater savings and convenience at select pharmacies." To this end, GoodRx emphasized that it "partner[s] with Kroger, the fourth largest retail pharmacy in the United States, to offer a tailored subscription product to Kroger consumers" and represented that the "subscription offerings are designed to be easy to use and provide subscribers with added benefits and features."

33. Similarly, in connection with its annual report for 2021 filed with the SEC on February 28, 2022, GoodRx again highlighted the Kroger Rx Savings Club, in which the Company "partner[s] with Kroger, one of the largest retail pharmacies in the United States, to offer a tailored subscription product to Kroger consumers."

34. During GoodRx's investor earnings call held that same day to discuss the Company's fourth quarter and full-year 2021 financial results, Defendant Bezdek emphasized that the Company's "relationships with PBMs remain great. . . . [and GoodRx's] relationships with [pharmacies] are very good." Defendant Bezdek further noted that the Company had not "seen any significant changes or developments" with these partners that would have a material impact on financial results.

35. Less than a month later at the Deutsche Bank Media, Internet and Telecom Conference on March 15, 2022, Defendant Voermann, when asked about possible pressures from the Company's partners (including pharmacies) that would disrupt the Company's revenue model, deflected the question and instead reiterated

that GoodRx "ha[s] deep relationships with all of the big pharmacies out there. . . . [and] we feel like our relationship with all the big pharmacies, which is where all the volume flows through are really strong."

36. The statements set forth in ¶¶ 27–35 were materially false and/or misleading when made because Defendants misrepresented and/or failed to disclose that: (1) while Kroger accounted for less than 5% of the pharmacies accepting GoodRx discounts, Kroger was responsible for nearly 25% of GoodRx's total prescription transactions revenue (the Company's primary revenue stream); and (2) Kroger could unilaterally cease accepting GoodRx discounts, cutting off some or all of GoodRx's revenues for purchases at Kroger's pharmacies; and (3) as a result, Defendants' representations about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

### C. The Truth Begins to Emerges

37. On May 9, 2022, investors began to learn the truth about the Company's over-dependence on Kroger and the risk that, notwithstanding GoodRx's contractual agreement with Kroger forming the Kroger Rx Savings Club, Kroger could unilaterally refuse to accept GoodRx's discounts. In connection with its announcement of its first quarter 2022 financial results that day, GoodRx revealed that it "recognized that a grocery chain had taken actions late in the first quarter of 2022 that impacted acceptance of discounted pricing for a subset of drugs from PBMs" and that this "is expected to have an adverse impact on prescription transactions revenue in the future that may be material." Critically, the Company admitted that the disruption "could have an estimated revenue impact of roughly $30 million" in the second quarter of 2022, prompting GoodRx to issue disappointing second quarter 2022 revenue guidance of only about $190 million. GoodRx also acknowledged that "it is unlikely we will be able to achieve the FY 2022 guidance we provided on our fourth quarter earnings call" and revealed that it "will not be providing full year expectations at this time as the full year impact of the grocer issue is difficult to estimate."

38. During the Company's accompanying investor earnings call held the same day, Defendant Bezdek explained:

> This [issue] is [about] limiting acceptance of many [discount] programs at this grocer's pharmacy. This involves, to your point, essentially all PBMs. So this is across the vast majority of PBMs. . . . In this case, this grocer is negotiating with almost all PBMs at the same time, and that effectively meant that discount pricing became unavailable to consumers at the same time.

39. The Company further disclosed that, while the grocery chain's pharmacies comprised less than 5% of GoodRx's network of pharmacies, the grocery chain accounted for "almost 1/4 of its prescription transactions revenue."

40. While Defendants refused to identify the grocer, securities analysts who followed GoodRx—including analysts from Deutsche Bank and Barclays—concluded that the grocery chain was Kroger.

41. In response to concerns regarding the significant impact of Kroger's actions, the price of GoodRx common stock plummeted $2.78 per share, or 25.9%, from a close of $10.75 per share on May 9, 2022, to close at $7.97 per share on May 10, 2022.

42. Then on August 8, 2022, in an investor earnings call held in connection with the announcement of GoodRx's second quarter 2022 financial results, Defendant Bezdek informed investors that, as a result of the previously disclosed Kroger issue, "[w]e exited the second quarter seeing approximately 20% of the weekly volume we processed through [Kroger] before the issue beginning of March." Nevertheless, Defendant Bezdek sought to reassure investors and declared that "the grocer issue has been addressed."

43. On November 8, 2022, in connection with the announcement of GoodRx's third quarter 2022 financial results, investors learned more about the

Company's concentrated exposure to Kroger. As an initial matter, GoodRx revealed that "[t]he estimated impact of the grocer issue on third quarter [prescription transactions revenue] was approximately $40 million" and that, despite the previous quarter statement that "the grocer issue has been addressed," the Company expected "a combined $45 million to $50 million estimated impact to prescription transactions revenue related to the previously disclosed grocer issue and our continued consumer engagement efforts" in the fourth quarter of 2022.

44. During the investor earnings call held the same day, Defendant Bezdek provided further clarity and disclosed that the "amount of prescription transactions revenue associated with the grocer decreased from $12.4 million to $4.3 million during th[e] period and [wa]s still well under the $33.7 million from third quarter 2021."

45. Defendants also admitted that there continued to be a risk that pharmacies could unilaterally cease to accept GoodRx discounts, like Kroger had done. Specifically, Defendant Hirsch explained:

> We have continued to maintain our really strong PBM marketplace. But in addition, we are selectively direct contracting with pharmacies and including many of the largest chains. That hybrid model really lets us ensure network stability. We want to make sure we don't have and we don't anticipate having any similar issue [to the Kroger issue].

46. In response, the price of GoodRx common stock declined an additional $1.18 per share, or 22.5%, from a close of $5.24 per share on November 8, 2022, to close at $4.06 per share on November 9, 2022.

V. **CLASS ACTION ALLEGATIONS**

47. Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities that purchased or otherwise acquired GoodRx common stock during the Class Period (the "Class").

Excluded from the Class are Defendants, their agents, directors and officers of GoodRx, and their families and affiliates.

48. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

49. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a. Whether Defendants violated the Exchange Act;

    b. Whether Defendants omitted and/or misrepresented material facts;

    c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e. Whether the price of GoodRx common stock was artificially inflated; and

    f. The extent of damage sustained by members of the Class and the appropriate measure of damages.

50. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

51. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions. Plaintiff has no interests that conflict with those of the Class.

52. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## VI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

53. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among others:

   a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b. The omissions and misrepresentations were material;

   c. The Company's common stock traded on an efficient market;

   d. The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

   e. Plaintiff and the Class purchased GoodRx common stock between the time the Company and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

54. At all relevant times, the market for the Company's common stock was efficient because: (1) as a regulated issuer, the Company filed periodic public reports with the SEC; and (2) the Company regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## VII. NO SAFE HARBOR

55. Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that the forward-looking statement was false. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VIII. LOSS CAUSATION/ECONOMIC LOSS

56. Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class. The price of GoodRx common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. As a result of their purchases of GoodRx common stock during the Class Period, Plaintiff and the Class suffered economic loss, i.e., damages, under the federal securities laws.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

57. During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and

committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of GoodRx common stock during the Class Period.

## X. CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants**

58. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

59. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class to purchase Company common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

60. Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

61. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period

### COUNT II

**Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

62. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

63. The Individual Defendants acted as controlling persons of GoodRx within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

64. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

65. As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Company common stock during the Class Period.

## XI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

    a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

        b.      Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

        c.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

        d.      Such other and further relief as the Court may deem just and proper.

## XII. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: April 22, 2024          Respectfully submitted,

                                        **KESSLER TOPAZ MELTZER & CHECK, LLP**

                                        */s/ Stacey M. Kaplan*
STACEY M. KAPLAN (Bar No. 241989)
skaplan@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Plaintiff Lisa Marie Barsuli*