**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff and the Class*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA MARIE BARSULI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GOODRX HOLDINGS, INC., DOUGLAS HIRSCH, TREVOR BEZDEK, and KARSTEN VOERMANN,<br><br>Defendants. | Case No. 2:24-cv-03282-AB-AJR<br><br><u>CLASS ACTION</u><br><br>**CORRECTED AMENDED CLASS ACTION COMPLAINT**<br><br>**(1) Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants**<br><br>**(2) Violations of Section 20(a) of the Exchange Act Against All Defendants**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiff the Kalmanson Family, consisting of Betty Kalmanson, Lawrence Kalmanson, and Shawn Kalmanson ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through Lead Plaintiff's attorneys, for its First Amended Complaint against GoodRx Holdings, Inc. ("GoodRx" or the "Company"), Douglas Hirsch, Trevor Bezdek, and Karsten Voermann (collectively, "Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, interviews with former employees of the Company, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities & Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Lead Plaintiff believes that substantial additional evidentiary support will exist for allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities that purchased or otherwise acquired GoodRx common stock (collectively, "Class") between September 23, 2020, and November 8, 2022, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials. Excluded from the Class are Defendants, former and current officers and directors of GoodRx, the immediate family members of any of the above, or any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest.

2. GoodRx is a pharmaceutical services company that primarily generates revenue through a free app and website featuring a discount drug price comparison tool.

The Company also provides telehealth services, subscription savings plans, and discounts directly from pharmaceutical manufacturers through its app and website, although these services (even collectively) represent only a small fraction of the Company's overall revenue.

3. Because GoodRx's core discount program is free to consumers, it generates revenue from fees paid to GoodRx by pharmacy benefit managers ("PBMs") with whom it contracts. PBMs negotiate discounted pricing through their bargaining power from pharmaceutical wholesalers and manufacturers, and work with pharmacies to determine the rate that will be paid at the pharmacy by the consumer. The PBM receives payment from the pharmacy for each prescription dispensed pursuant to a formula negotiated between the pharmacy and PBM. PBMs are extremely lucrative: for example, OptumRx, UnitedHealth Group's PBM subsidiary, had about $116 billion in revenue for 2023, and CVS Caremark's PBM segment had revenues of more than $186 billion that year.

4. At its most basic level, the Company's price comparison tool is supposed to allow consumers to access prices that GoodRx's PBM partners have negotiated with chain and independent pharmacies by listing the prices that the PBMs indicate for a given drug at nearby locations, and presenting a GoodRx code that the consumer can provide to the pharmacy to obtain the drug at the price indicated in the price comparison tool. Although the consumer rather than insurance pays for the transaction, GoodRx indicates that the prices paid are often less than the consumer would be charged as a co-pay for the same prescription drug under a typical insurance plan. GoodRx is also available to users who lack pharmaceutical insurance coverage.

5. While GoodRx was ostensibly founded to "solve the challenges that consumers face in understanding, accessing, and affording healthcare," its business is that of a middleman, using its price comparison tool to take a cut from the pharmaceutical revenue that pharmacies pay to PBMs.

6. In its initial public offering ("IPO") prospectus and subsequent SEC filings, GoodRx described PBMs as its customers. The Company explained that the vast majority of its revenue "is generated from PBMs, or customers, when a prescription is filled with a GoodRx code provided through our platform, and saves money compared to the list price in that pharmacy. In our contracts with customers [PBMs], the nature of our promise is to direct prescription volume through our platform."

7. In return, GoodRx received a slice of the revenue the PBMs earned: "Contracts with PBMs provide that we are entitled to either a percentage of fees the PBM charges the pharmacy or fixed amount per type of medication prescription, when a consumer uses a GoodRx code provided through our platform."

8. The prospectus used by GoodRx to effect its IPO stated that GoodRx earned more than $242 million in revenue in 2018 from the transactions it directed to pharmacies serviced by its PBM partners, a metric which it called "Prescription Transactions Revenue." This represented more than 97% of the Company's revenue for fiscal year 2018, and throughout the Class Period, Prescription Transactions Revenue accounted for the overwhelming majority of revenue.

9. On the basis of its strong Prescription Transactions Revenue, on September 23, 2020, GoodRx successfully went public and its common stock began trading on the NASDAQ. Shares jumped 40% in their debut ***even after*** the IPO priced well above its target range.

10. Beginning with its IPO prospectus and throughout the Class Period, the Company claimed that GoodRx codes were accepted at every major retail pharmacy location in the United States. This claim was highly misleading because it omitted that GoodRx had not secured contracts or any other assurance ensuring that its codes would be accepted. Instead, the referenced retail pharmacy locations merely represented pharmacies within the network of various PBMs, which PBMs agreed to have prices listed on GoodRx's price comparison platform. While GoodRx had contracted with these PBMs to gain access to PBM price lists for these locations, GoodRx had not

secured agreement with the retail pharmacies themselves to guarantee that GoodRx codes would be accepted to access those prices when presented by GoodRx users.

11. Throughout the Class Period, Defendants also concealed from investors its overexposure to Kroger pharmacies. Although investors were told that Kroger pharmacies amounted to 5% of the pharmacies in which the codes could be used, transactions at Kroger pharmacies amounted to approximately 25% of Prescription Transactions Revenue. This roughly 500% over-indexing, which materially exposed GoodRx to any rejection by Kroger, was hidden from investors. A former employee explained that GoodRx made more money off Kroger than other pharmacies as a result of Kroger having struck bad deals with its PBMs, and therefore GoodRx often put Kroger at the top of its lists to consumers. *See* ¶39, *infra*.

12. Worse still, investors had no reason to suspect that GoodRx would be exposed to rejection at Kroger, since GoodRx touted that it contracted with Kroger to provide a subscription service, the Kroger Savings Club powered by GoodRx (the "Kroger Savings Club"), for those consumers who wanted even steeper discounts than those offered through the core free app. GoodRx did not disclose to investors its contract with Kroger establishing the Kroger Savings Club, and did not inform them that it had not secured any assurance from Kroger in that contract or otherwise that Kroger would accept codes from the core free app. Instead, it consistently listed Kroger as a pharmacy in which such codes could be used.

13. Investors began to learn the truth on May 9, 2022, in an earnings call to discuss the results for Q1 2022. On the call, GoodRx revealed that "a grocery chain had taken actions late in the first quarter of 2022 that impacted acceptance of discounted pricing for a subset of drugs from PBMs." As a result, investors learned that GoodRx had not secured acceptance of its codes at this "grocery chain," which was widely understood to refer to Kroger. The Company further explained that this rejection was expected to have a "material" adverse impact, potentially reducing revenue by $30 million in Q2 2022 alone. As a result, GoodRx issued disappointing revenue guidance

for the remainder of Q2 2022, stated that it was unlikely to achieve its previously forecasted fiscal year 2022 guidance, and revealed that it would not be providing new guidance for fiscal year 2022.

14. The Company also revealed that while the referenced grocery chain represented less than 5% of all pharmacies in the purported GoodRx network by store count, it was responsible for almost a quarter of all Prescription Transactions Revenue for Q1 2022.

15. On this news, GoodRx's common stock plummeted $2.78 per share, or 25.9%, from a close of $10.75 per share on May 9, 2022, to close at $7.97 per share on May 10, 2022. The full decline was blunted because Defendants did not reveal the actual impact of Kroger's rejection of GoodRx codes.

16. On August 8, 2022, as part of an earnings call to announce the Company's results for the second fiscal quarter of 2022, the Company explained that it saw only a fifth of the weekly volume through Kroger by the end of the quarter compared to the volumes the Company was seeing before the "grocer issue" arose. Put another way, Kroger's rejection of GoodRx codes was so prevalent that the weekly volume of GoodRx codes processed at Kroger dropped by 80%. Nevertheless, Defendant Bezdek sought to reassure investors and declared that "the grocer issue ha[d] been addressed."

17. Defendants' assurances were false. On an earnings call on November 8, 2022, GoodRx revealed that the impact of having failed to secure acceptance of GoodRx codes at Kroger was actually $45 million to $50 million, not up to $30 million as investors were previously told. The Company also admitted that to avoid recurrence it needed to directly contract with pharmacy chains. Specifically, GoodRx announced that it had decided to start entering into select direct contracting relationships with retail pharmacies to "ensure network stability." It also admitted that there continued to be a risk that without contractual guarantees pharmacies could unilaterally cease to accept GoodRx codes, just as Kroger had done.

18. On these disclosures, the price of GoodRx common stock declined an additional $1.18 per share, or 22.5%, from a close of $5.24 per share on November 8, 2022, to close at $4.06 per share on November 9, 2022.

19. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other members of the Class have suffered significant losses and damages.

## JURISDICTION AND VENUE

20. Lead Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5.

21. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

22. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). GoodRx maintains its headquarters in Santa Monica, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. Further, Lead Plaintiff is informed and believes, based on their LinkedIn profiles, that Defendants Hirsch and Bezdek reside in this District.

23. In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

24. Lead Plaintiff members Betty Kalmanson, Lawrence Kalmanson and Shawn Kalmanson purchased or otherwise acquired GoodRx common stock during the Class Period, as described in their Certification, *see* ECF No. 40-3, and suffered

damages as a result of Defendants' violations of the federal securities laws alleged herein.

25. Defendant GoodRx is a Delaware corporation with its principal place of business in this District at 2701 Olympic Boulevard, Santa Monica, California 90404.

26. During the Class Period, Defendant Hirsch was GoodRx's Co-Chief Executive Officer and a Company director. Defendant Hirsch currently serves as the Company's Chief Mission Officer and as a director for the Company and is also a co-founder of the Company. Defendant Hirsch signed the Company's Form S-1 Registration Statement incorporating the IPO prospectus filed August 28, 2020, amended on September 14, 2020 and September 22, 2020, and made effective on September 22, 2020 (the "Registration Statement"), as well as the Company's Form 10-Q filed for the quarterly period ending September 30, 2020, filed November 12, 2020 (the "Q3 2020 10-Q"), the Form 10-K for the fiscal year ending December 31, 2020, filed on March 12, 2021 (the "2020 10-K"), and the Form 10-K for the fiscal year ending December 31, 2021, filed on March 1, 2022 (the "2021 10-K"), and was a maker of the statements contained in those documents. He was also the maker of additional statements alleged in paragraphs 68, 72, and 81.

27. During the Class Period, Defendant Bezdek was GoodRx's Co-Chief Executive Officer and a director of the Company. Defendant Bezdek currently serves as the Company's Chairman and as a Company director. Defendant Bezdek is also a co-founder of the Company. Defendant Bezdek also signed the Company's Registration Statement incorporating the IPO prospectus, the Q3 2020 10-Q, the 2020 10-K, and the 2021 10-K, and was a maker of the statements contained in those documents. He was also the maker of additional statements alleged in paragraphs 64 and 75.

28. During the Class Period, Defendant Voermann was GoodRx's Chief Financial Officer and he continues to serve in this position at the Company. He also signed the Company's Registration Statement incorporating the IPO prospectus, the Q3

2020 10-Q, the 2020 10-K, and the 2021 10-K, and was the maker of the statements contained in those documents. Defendant Voermann also made the materially false and misleading statements alleged herein in Paragraph 88.

29. Defendants Hirsch, Bezdek, and Voermann are collectively referred to herein as the "Individual Defendants."

30. The Individual Defendants, because of their positions in the Company, possessed the power and authority to control the contents of GoodRx's SEC filings, press releases, and presentations to securities analysts, money and portfolio managers, institutional investors, and the market generally. Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that positive representations that were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### I. GoodRx's Business

31. About a decade ago, Defendants Hirsch and Bezdek created GoodRx to be a digital U.S. prescription drug shopping platform to help people find the lowest prescription drug prices in their local areas. In October 2015, GoodRx acquired 100% of the outstanding shares of GoodRx, Inc., the entity that owns and operates the digital shopping platform created by Defendants Hirsch and Bezdek.

32. GoodRx's core business is to provide a discount program that provides consumers free access to discounted pricing on prescription drugs, especially generic prescription drugs, by use of PBM price lists. Consumers access GoodRx's platform through its app and website. GoodRx's business model depends upon pharmacies accepting codes provided through the app and website to dispense the drugs in question

at the reduced prices listed by GoodRx. The consumer then presents the code to the pharmacist and pays for the drug with cash or credit (as opposed to insurance) at the price listed by GoodRx. According to GoodRx, in many cases, the discounted prices it lists are lower than insurance co-pays.

33. GoodRx's most popular and best-known product is a price comparison tool for prescription drugs. This is available through the Company's app and website to users in the United States. The Company also provides telehealth services, subscription savings plans, and discounts directly from pharmaceutical manufacturers through its app and website, although these services represent a far smaller portion of the Company's overall business. This has remained true over time:

| Year | Prescription Transactions Revenue from core offering | Percentage of overall revenue |
|---|---|---|
| 2018 | $242.9 million | 97.4% |
| 2019 | $364.6 million | 93.9% |
| 2020 | $488.3 million | 88.7% |
| 2021 | $593.4 million | 79.6% |
| 2022 | $550.5 million | 71.8% |

Sources: IPO prospectus, Forms 10-K for 2021 and 2022.

34. The Company's price comparison tool was intended to steer consumers to purchase prescription drugs at discount prices that PBMs partnering with GoodRx have negotiated with pharmacies in their respective networks. GoodRx receives fees from the PBMs (which in turn are paid by the pharmacy). The arrangement is intended to permit GoodRx users to access PBMs' lower negotiated prices, especially for generic prescription drugs, rather than paying the much higher "list prices" at many pharmacies by presenting a GoodRx code.

35. On September 25, 2020, GoodRx closed its IPO of 39,807,691 shares of the Company's Class A common stock at an offering price of $33.00 per share, pursuant to a registration statement that the Company filed on Form S-1 on August 28, 2020, as

amended by Forms S-1/A filed on September 14 and 22, 2020, and by the final prospectus filed on Form 424B4 on September 24, 2020 ("IPO prospectus"), which was incorporated in all material respects in the registration statement signed by each of the Individual Defendants. The IPO prospectus claimed that the "typical consumer savings process can be summed up in three easy steps": searching for a prescription, discovering its price, and presenting GoodRx at a pharmacy for the discounted price, as illustrated in the chart below:




Search By Prescription

Price Discovery

Present GoodRx At Pharmacy For Discounted Price

36. Through contracts with PBMs, when a customer uses a GoodRx code, the Company receives either a percentage of the fees that a PBM charges a pharmacy or a fixed amount per prescription. The below chart provides an illustrative example:




37. Former Employee 1 ("FE1") confirms that this was the way GoodRx operated. FE1 was a senior finance executive at GoodRx from 2022 to 2023 who reported to the Senior Vice President of Finance at the Company, who in turn reported directly to Defendant Voermann. FE1 was responsible for financial planning & analysis ("FP&A") at GoodRx. FE1 was originally an employee at a company which GoodRx later acquired in 2021.

38. According to FE1, the "secret sauce" behind GoodRx was its ability to drive additional sales volume for PBMs—*i.e.*, the Company's offering underlying its Prescription Transactions Revenue.

39. FE1 explained that the PBMs provide prices to GoodRx, which gets paid a different level depending on what pharmacy is used, and the contracts between that pharmacy and its partner PBMs. According to FE1, Kroger was often placed at the top

of the GoodRx price comparison because GoodRx made more from prescriptions filled at Kroger due to bad deals that Kroger had negotiated with PBMs.

40. From its founding, GoodRx has stressed its ability to track data in the healthcare industry. In its IPO prospectus, the Company boasted about its data-driven process when it described the price comparison tool that drove the Company's Prescription Transactions Revenue: "Over the past nine years, we have built a vast network of relationships, contracts and integrations with key stakeholders in the healthcare industry. Our proprietary technology enables us to aggregate over 150 billion prescription pricing data points every day from sources spanning the healthcare industry."

41. Defendant Hirsch consistently stressed this numbers-driven approach as a key to GoodRx's success. For example, at a Cowen Insights/FutureHealth Conference on June 17, 2021, Defendant Hirsch explained that the GoodRx app is powered by "200 billion price points every day from sources across all of healthcare." He described himself and co-founders as "a bunch of geeks and engineers and product people" who wanted to gather this information for consumers and present it in a usable format.

42. This data-driven approach permeated through GoodRx's corporate structure. FE2 explained that GoodRx was a very data-driven organization. FE2 was a former Business Intelligence Manager at GoodRx who worked in different marketing, analytics, and insights roles at the Company from July 2018 to June 2023. In this role, FE2 reported to individuals who reported directly to the Individual Defendants, including former Director of Business Intelligence Tony Chang; Vice President of Insights, Marketing, and Digital Experience Elise Vitalo; Chief Brand Officer Simon Cassels; Senior Vice President of Corporate Strategy & Business Operations Justin Fengler; and Vice President of Business Intelligence Joe Ferraro. As part of these positions, FE2 frequently examined important internal tracking data, including market efficiency, new users, and GoodRx code redemptions.

43. FE2 explained that the Company used Amazon RedShift to house its data generated by claims that were processed at retail pharmacies and through PBMs. This data came in a day or two after a prescription was filled and provided granular data about claims, including user information, the prescription drug that was filled, the PBM network that was used, and the pharmacy it came from. This allowed the Company to aggregate data on a regular basis for internal analysis and reporting purposes. According to FE2, daily reports were prepared assessing this granular data on a pharmacy-by-pharmacy level. Per FE2, Senior Vice President and General Manager of Prescription Businesses, Roger Smith, oversaw a team that monitored this type of data in near real-time.

44. Another former employee, FE3, confirmed that GoodRx received claims data nearly daily. FE3 confirmed that this data included pharmacy and PBM-level information about each claim and showed the financial impact of any particular retail pharmacy to its operations. FE3 was a high-level manager in Business Intelligence at the Company from April 2021 to January 2022, and reported to Senior Vice President of Corporate Strategy & Business Operations, Justin Fengler. Justin Fengler, in turn, reported directly to Defendants Hirsch and Bezdek.

45. Further, FE2 explained that, monthly, several executives (including Individual Defendants) were provided a report aggregating detailed information about the prior month's transactions.

46. Also according to FE2, Defendants Bezdek and Hirsch oversaw monthly all-hands meetings to discuss the state of the Company and new developments. Each team would provide updates, with one team providing a deep dive in its particular area of expertise. Defendant Voermann would generally provide month-to-month financial changes during these all-hands meetings.

47. The "grocer issue" revealed at the end of the Class Period came up during these monthly meetings when GoodRx code redemptions began to stagnate or decline

in early 2022, but according to FE2 it was kept under wraps and not fully discussed at the meeting because there was a real awareness that it was not going to play well.

48. FE2 further noted that the Company also had teams that were constantly meeting with pharmacies throughout FE2's time at the Company, including to discuss fee structures and the benefits that GoodRx can provide to retail pharmacies.

**II. GoodRx's Relationship with Kroger**

49. FE4 joined GoodRx in October 2016 and later served as Vice President of Business Solutions for GoodRx from July 2019 to January 2022. In this role, FE4 reported to Pharmacy Strategy Officer Jim Sheninger, who reported to Defendant Bezdek. During FE4's time at the Company, FE4 developed and managed the Kroger Savings Club.

50. On December 12, 2018, the Company and Kroger announced that they had joined together to offer the Kroger Savings Club. Per a press release issued that day, the Kroger Savings Club provides customers with exclusive access to discounts on commonly prescribed generic medications for widespread conditions in the United States. The program offered three tiers of low-cost medications to subscribers: free 30-day/90-day prescriptions for certain generic medications, $3 30-day/$6 90-day prescriptions for certain generic medications, or $6 30-day/$12 90-day prescriptions for certain generic medications. The Kroger Savings Club cost $36 annually for individuals and $72 annually for a family. The press release stated that these savings would be available throughout Kroger's 2,200 retail pharmacy locations in the United States.

51. While FE4 developed the Kroger Savings Club at GoodRx, FE4 worked with two individuals at Kroger: Leanne Kent and Frannie McGowan. Frannie McGowan served as Senior Vice President of Business Development & Strategy at Kroger Health before joining Scriptcycle as Chief Executive Officer in August 2020. Leanne Kent served as Vice President of Payor Contracting and Strategy at Kroger Health prior to joining Scriptcycle, which GoodRx purchased in August 2020 just before its IPO.

52. Although, to Lead Plaintiff's knowledge, GoodRx has not disclosed its contract with Kroger for the Kroger Savings Club, FE4 indicated that the Kroger Savings Club did not require Kroger to accept codes generated by the free GoodRx website or app. Similarly, FE3 recalls Justin Fengler, the Senior Vice President of Corporate Strategy & Business Operations to whom FE3 directly reported, telling FE3 that GoodRx did not have direct contracts with retail pharmacies.

### III. Defendants Make False Statements in Connection with GoodRx's IPO

53. The Class Period begins on September 23, 2020, to coincide with GoodRx's IPO. Just prior to that IPO, Defendants caused to be published the IPO registration statement on Form S-1, as amended and signed by each of the Individual Defendants, and the IPO prospectus, a copy of which in all material respects was contained within the registration statement.

54. On September 23, 2020, the Company priced its IPO at $33 per share (above its $24 to $28 per share target) and raised more than $1.1 billion.

55. In its IPO prospectus, GoodRx touted the widespread and diversified acceptance of GoodRx discounts, stating that "[c]onsumers can use GoodRx at over 70,000 pharmacies, nearly every retail pharmacy in the United States." When explaining the risks that the Company may face, the IPO prospectus also explained that:

> Our consumers use GoodRx codes at the point of purchase at nearby pharmacies. These codes can be used at over 70,000 pharmacies in the United States. The U.S. prescriptions market is dominated by a limited number of national and regional pharmacy chains, such as CVS, Kroger, Walmart and Walgreens. These pharmacy chains represent a significant portion of overall prescription medication transactions in the United States. Similarly, a significant portion of our discounted prices are used at a limited number of pharmacy chains and, as a result, a significant portion of our revenue is derived from transactions processed at a limited number of pharmacy chains.

56. The statements identified in Paragraph 55 were materially false and misleading when made because they omitted the following information: (a) consumers could only use GoodRx codes at the "over 70,000 pharmacies in the United States" referenced if accepted by the pharmacy at the time of purchase; (b) the Company had

not secured contracts with its largest and most important pharmacies, including Kroger, requiring that GoodRx codes would be accepted; and (c) the Company was substantially and intentionally overexposed to Kroger, which it often placed at the top of its comparisons because it made more money from Kroger, and as a result relied on Kroger prescriptions for nearly a quarter of its Prescription Transactions Revenue, a unique concentration risk that was not disclosed and was not "similar[]" to each pharmacy chain's "portion of overall prescription medication transactions in the United States."

57. In touting "***The Size and Strength of our Healthcare Partner Network***" (emphasis in original), the IPO prospectus also stated: "Our proprietary technology platform aggregates data from a variety of different sources on a daily basis to present consumers with curated, geographically relevant prescription pricing that can be used to save money at every major retail pharmacy."

58. The statements identified in Paragraph 57 were materially false and misleading when made because they omitted the following information: (a) GoodRx had not secured contracts with the overwhelming majority of the pharmacy chains referenced, including Kroger, that would require the pharmacy to accept GoodRx codes; and (b) as a result, GoodRx consumers were not provided pricing that "can be used to save money at every major retail pharmacy."

59. Similarly, in defining the term "discounted price" for GoodRx's core offering, the IPO prospectus stated: "[O]ur discounted prices are free to access for consumers by saving a GoodRx code to their mobile device for their selected prescription and presenting it at the chosen pharmacy." This statement was materially false and misleading when made because it omitted the following information: (a) GoodRx had not secured contracts with most major pharmacy chains, including Kroger, that would require the pharmacy to accept GoodRx codes; and (b) as a result, there was no assurance that a GoodRx consumer could obtain discount pricing by presenting a GoodRx code "at the chosen pharmacy."

60. The IPO prospectus also referenced GoodRx's joint subscription plan with Kroger, the Kroger Savings Club, seventeen times to emphasize the Company's deep commercial relationship with Kroger, but omitted the most important point: that despite having a joint business relationship with Kroger, GoodRx had not secured that Kroger would accept its far more important core offering codes when presented by consumers.

61. Also on September 23, 2020, GoodRx's website stated under its "Find a Pharmacy Near Me" page that visitors could "Save up to 80% on your prescriptions at pharmacies near you with discounts and coupons from GoodRx. Look up the prices of your meds at local pharmacies, including" Albertson's, CVS Pharmacy, Costco, Kroger Pharmacy, Medicine Shoppe, Rite Aid, Safeway, Target (CVS), Walgreens, and Walmart, as reflected in the screenshot below:[1]




62. The statements identified in Paragraph 61 were materially false and misleading when made because they omitted the following information: (a) consumers could only use GoodRx codes at Kroger and the other pharmacies listed if the pharmacy agreed to accept the code at the time of purchase; and (b) GoodRx had not secured contracts with its largest and most important pharmacies, including Kroger, specifying that GoodRx codes be accepted.

**IV. Defendants Make Additional Misrepresentations**

[1] Source: web.archive.org/web/20200923213514/https://www.goodrx.com/pharmacy-near-me

63. On November 12, 2020, the Company held its first earnings call as a public company. In that earnings call, Defendant Voermann touted that Prescription Transactions Revenue grew 30% year-over-year for the quarter to $124.4 million. This represented nearly 89% of the Company's total revenue for the quarter. During that call, Defendant Bezdek explained that the Company had closed a multi-year extension of its partnership with Kroger to continue to run the Kroger Savings Club as part of a "fruitful relationship."

64. Also during the earnings call, Defendant Bezdek claimed the Company "allow[ed] consumers to save money on their medications by simply presenting GoodRx at one of the 70,000 pharmacies where GoodRx's accepted."

65. The statements identified in Paragraph 64 were materially false and misleading when made because they omitted the following information: (a) consumers could only use GoodRx at the "70,000 pharmacies" referenced if accepted by the pharmacy at the time of purchase; (b) the Company had not secured contracts with its largest and most important pharmacies, including Kroger, requiring that GoodRx codes would be accepted; and (c) the Company was substantially and intentionally overexposed to Kroger, which it often placed at the top of its comparisons because it made more money from Kroger, and as a result relied on Kroger prescriptions for nearly a quarter of its Prescription Transactions Revenue, a unique concentration risk that was not disclosed.

66. On November 12, 2020, GoodRx filed with the SEC its Q3 2020 10-Q, signed by Individual Defendants. In the Q3 2020 10-Q, GoodRx again explained that:

> Our consumers use GoodRx codes at the point of purchase at nearby pharmacies. These codes can be used at over 70,000 pharmacies in the United States. The U.S. prescriptions market is dominated by a limited number of national and regional pharmacy chains, such as CVS, Kroger, Walmart and Walgreens. These pharmacy chains represent a significant portion of overall prescription medication transactions in the United States. Similarly, a significant portion of our discounted prices are used at a limited number of pharmacy chains and, as a result, a significant portion of our revenue is derived from transactions processed at a limited number of pharmacy chains.

67. The statements identified in Paragraph 66 were materially false and misleading when made because they omitted the following information: (a) consumers could only use GoodRx codes at the "over 70,000 pharmacies in the United States" referenced if accepted by the pharmacy at the time of purchase; (b) the Company had not secured contracts with its largest and most important pharmacies, including Kroger, requiring that GoodRx codes would be accepted; and (c) the Company was substantially and intentionally overexposed to Kroger, which it often placed at the top of its comparisons because it made more money from Kroger, and as a result relied on Kroger prescriptions for nearly a quarter of its Prescription Transactions Revenue, a unique concentration risk that was not disclosed and was not "similar[]" to each pharmacy chain's "portion of overall prescription medication transactions in the United States."

68. On November 18, 2020, at the RBC Capital Markets Global TIMT Virtual Conference, Defendant Hirsch stated that there were "70,000 pharmacies where GoodRx is accepted."

69. The statements identified in Paragraph 68 were materially false and misleading when made because they omitted the following information: (a) consumers could only use GoodRx at the "70,000 pharmacies" referenced if accepted by the pharmacy at the time of purchase; (b) the Company had not secured contracts with its largest and most important pharmacies, including Kroger, requiring that GoodRx codes would be accepted; and (c) the Company was substantially and intentionally overexposed to Kroger, which it often placed at the top of its comparisons because it made more money from Kroger, and as a result relied on Kroger prescriptions for nearly a quarter of its Prescription Transactions Revenue, a unique concentration risk that was not disclosed.

70. On November 19, 2020, GoodRx's website still stated under its "Find a Pharmacy Near Me" page that visitors could "Save up to 80% on your prescriptions at pharmacies near you with discounts and coupons from GoodRx. Look up the prices of your meds at local pharmacies, including" Albertson's, CVS Pharmacy, Costco, Kroger

Pharmacy, Medicine Shoppe, Rite Aid, Safeway, Target (CVS), Walgreens, and Walmart, as reflected in the screenshot below:[2]




71. The statements identified in Paragraph 70 were materially false and misleading when made because they omitted the following information: (a) consumers could only use GoodRx codes at Kroger and the other pharmacies listed if the pharmacy agreed to accept the code at the time of purchase; and (b) GoodRx had not secured contracts with its largest and most important pharmacies, including Kroger, specifying that GoodRx codes be accepted.

72. On December 10, 2020, at the Barclays Global Technology, Media and Telecommunications Conference, Defendant Hirsch described GoodRx as follows: "It really is so simple. You just download our app, you present it at the pharmacy, it works just like a coupon does at the grocery store."

73. The statements identified in Paragraph 72 were materially false and misleading when made because they: (a) omitted that a GoodRx code can only be used if a particular pharmacy accepts it at the time of sale; (b) omitted that the Company lacked contracts with its largest and most important pharmacies specifying that GoodRx codes be accepted, including Kroger, notwithstanding the fact that GoodRx ran the

---

[2] Source: web.archive.org/web/20201119150816/https://www.goodrx.com/pharmacy-near-me

Kroger Savings Club; (c) falsely stated that its codes worked "just like a coupon does at the grocery store" because unlike coupons, their acceptance was entirely dependent on the assent of a given pharmacy and the relationship of the pharmacy and its PBM partners; and (d) omitted that the Company was substantially and intentionally overexposed to Kroger, which it often placed at the top of its comparisons because it made more money from Kroger, and as a result relied on Kroger prescriptions for nearly a quarter of its Prescription Transactions Revenue, a unique concentration risk that was not disclosed.

74. On March 11, 2021, the Company held an earnings call to discuss its results for the final quarter of 2020. Once again, Prescription Transactions Revenue accounted for the vast majority of the Company's quarterly revenue, growing 26% year-over-year to $131.3 million, or 86% of all quarterly revenue.

75. During that earnings call, while touting the Company's ability to purportedly help consumers pay less for prescription medications, Defendant Bezdek claimed during the Company's latest fiscal quarter, it "helped a record 5.6 million monthly active consumers, saving them prescriptions by using GoodRx at one of our 70,000 participating pharmacies."

76. The statements identified in Paragraph 75 were materially false and misleading when made because they omitted the following information: (a) consumers could only use GoodRx at the "70,000 pharmacies" referenced if accepted by the pharmacy at the time of purchase; (b) the Company had not secured contracts with its largest and most important pharmacies, including Kroger, requiring that GoodRx codes would be accepted; and (c) the Company was substantially and intentionally overexposed to Kroger, which it often placed at the top of its comparisons because it made more money from Kroger, and as a result relied on Kroger prescriptions for nearly a quarter of its Prescription Transactions Revenue, a unique concentration risk that was not disclosed.

77. On March 12, 2021, GoodRx filed its 2020 10-K, signed by Individual Defendants. In its 2020 10-K, GoodRx explained that:

> Our consumers use GoodRx codes at the point of purchase at nearby pharmacies. These codes can be used at over 70,000 pharmacies in the United States. The U.S. prescriptions market is dominated by a limited number of national and regional pharmacy chains, such as CVS, Kroger, Walmart and Walgreens. These pharmacy chains represent a significant portion of overall prescription medication transactions in the United States. Similarly, a significant portion of our discounted prices are used at a limited number of pharmacy chains and, as a result, a significant portion of our revenue is derived from transactions processed at a limited number of pharmacy chains.

78. The statements identified in Paragraph 77 were materially false and misleading when made because they omitted the following information: (a) consumers could only use GoodRx codes at the "over 70,000 pharmacies in the United States" referenced if accepted by the pharmacy at the time of purchase; (b) the Company had not secured contracts with its largest and most important pharmacies, including Kroger, requiring that GoodRx codes would be accepted; and (c) the Company was substantially and intentionally overexposed to Kroger, which it often placed at the top of its comparisons because it made more money from Kroger, and as a result relied on Kroger prescriptions for nearly a quarter of its Prescription Transactions Revenue, a unique concentration risk that was not disclosed and was not "similar[]" to each pharmacy chain's "portion of overall prescription medication transactions in the United States."

79. On May 27, 2021, GoodRx published an article on its website entitled *What's the Deal with GoodRx? FAQs from Pharmacy Staff*. The article listed its author as "GoodRx." In this article, GoodRx stated that "[p]articipating pharmacies are required to accept GoodRx through contracts with their pharmacy benefit managers (PBMs)." The article elaborated that "[p]harmacies listed on our website belong to the PBM networks that we partner with and are contractually obligated to accept GoodRx." The article also stated that "in some instances, GoodRx also works with pharmacies directly."

80. The statements identified in Paragraph 79 were materially false and misleading when made because major pharmacies including Kroger were not "contractually obligated" to accept GoodRx, and because the statements omitted that the Company had not secured contracts with its largest and most important pharmacies, including Kroger, requiring that GoodRx codes be accepted.

81. On June 17, 2021, at the Cowen Insights/FutureHealth Conference, Defendant Hirsch discussed GoodRx's offerings to consumers in the following exchange with Cowen's Health Care Technology analyst Charles Rhyee (emphasis added):

> Rhyee: Yeah. And then maybe this is a good segue, then let's talk a little bit about the core offering here. Maybe talk about, how is it that you're able to provide consumers with the lowest price when they go to the GoodRx app?
>
> Hirsch: Well, the magic number is 200 billion. We get 200 billion price points every day from sources across all of healthcare. And that's important. If you, again, go back to when me and my two co-founders got started, we were just in the information gathering business. We were a bunch of geeks and engineers and product people, I worked at Facebook and Yahoo before that. And we just were like, "There must be answers on the internet." And so that was the original quest and it remains so today, which is, how do we get this information? Not only get it, but then clean it up and make it clean, and make it in a way that a consumer could just simply be able to type in the name of a drug and see answers, just like you should at any, I'd say interactive experience. **And so what we've established over 10 years is incredible relationships and contracts with all the key stakeholders in healthcare**.
>
> So that would be the PBMs, the pharmacies, manufacturers, patient assistance programs. So we can basically bring all these prices to get all these 200 billion price points together every day, and then just spit out the best one for you, the one that makes most sense for Charles to get his statin or whatever that is. We work with pretty much every major PBM in the country, and we continue to add new ones all the time, which ultimately allows us to drive better pricing for consumers. And then with this technology that we have, this incredible proprietary technology, we take all those price points, we put them all together. But again, to the consumer, it looks super simple. One of the things I do as a product guy is I think about most importantly what not to show you. There's too much noise in the healthcare, I'm just going to basically show you a price and then a coupon which consumers understand from other industries. And it just makes it so simple.

82. The statements identified in Paragraph 81 were materially false and misleading when made because: (a) GoodRx had not secured "contracts with all the key stakeholders in healthcare" including large pharmaceutical chains like Kroger; (b) the statements omitted that a GoodRx code was not the same as coupons found in "other industries" because it can only be used if a particular pharmacy decides to accept it at the time of sale, and may depend on the ability of a third-party PBM to force acceptance; (c) omitted that the Company lacked contracts with its largest and most important pharmacies specifying that GoodRx codes be accepted, including Kroger; and (d) omitted that the Company was substantially and intentionally overexposed to Kroger, which it often placed at the top of its comparisons because it made more money from Kroger, and as a result relied on Kroger prescriptions for nearly a quarter of its Prescription Transactions Revenue, a unique concentration risk that was not disclosed.

83. On July 13, 2021, GoodRx's website still stated under its "Find a Pharmacy Near Me" page that visitors could "Save up to 80% on your prescriptions at pharmacies near you with discounts and coupons from GoodRx. Look up the prices of your meds at local pharmacies, including" Albertson's, CVS Pharmacy, Costco, Kroger Pharmacy, Medicine Shoppe, Rite Aid, Safeway, Target (CVS), Walgreens, and Walmart, as reflected in the screenshot below:[3]


GoodRx » Pharmacies

Find a Pharmacy Near Me

Save up to 80% on your prescriptions at pharmacies near you with discounts and coupons from GoodRx. Look up the prices of your meds at local pharmacies, including:

- Albertsons
- CVS Pharmacy
- Costco
- Kroger Pharmacy
- Medicine Shoppe
- Rite Aid
- Safeway
- Target (CVS)
- Walgreens
- Walmart

[3] Source: web.archive.org/web/20210713222206/https://www.goodrx.com/pharmacy-near-me

84. The statements identified in Paragraph 83 were materially false and misleading when made because they omitted the following information: (a) consumers could only use GoodRx codes at Kroger and the other pharmacies listed if the pharmacy agreed to accept the code at the time of purchase; and (b) GoodRx had not secured contracts with its largest and most important pharmacies, including Kroger, specifying that GoodRx codes be accepted.

85. On March 1, 2022, GoodRx filed with the SEC its 2021 10-K, signed by Individual Defendants. It reported that Prescription Transactions Revenue totaled nearly a whopping $594 million. This represented approximately 80% of the Company's entire revenues of more than $745 million for the fiscal year. By comparison, its entire subscription offering—which includes both the GoodRx Gold plan and Kroger Savings Club—generated less than $60 million in revenue (about 8% of the Company's total revenue).

86. In its 2021 10-K, GoodRx explained that:

> Our consumers use GoodRx codes at the point of purchase at nearby pharmacies. These codes can be used at over 70,000 pharmacies in the United States. The U.S. prescriptions market is dominated by a limited number of national and regional pharmacy chains, such as CVS, Kroger, Walmart and Walgreens. These pharmacy chains represent a significant portion of overall prescription medication transactions in the United States. Similarly, a significant portion of our discounted prices are used at a limited number of pharmacy chains and, as a result, a significant portion of our revenue is derived from transactions processed at a limited number of pharmacy chains.

87. The statements identified in Paragraph 86 were materially false and misleading when made because they omitted the following information: (a) consumers could only use GoodRx codes at the "over 70,000 pharmacies in the United States" referenced if accepted by the pharmacy at the time of purchase; (b) the Company had not secured contracts with its largest and most important pharmacies, including Kroger, requiring that GoodRx codes would be accepted; and (c) the Company was substantially and intentionally overexposed to Kroger, which it often placed at the top of its comparisons because it made more money from Kroger, and as a result relied on Kroger

prescriptions for nearly a quarter of its Prescription Transactions Revenue, a unique concentration risk that was not disclosed and was not "similar[]" to each pharmacy chain's "portion of overall prescription medication transactions in the United States."

88. On March 15, 2022, at the Deutsche Bank 30th Annual Media, Internet & Telecom Conference, Defendant Voermann discussed GoodRx's relationship with various players in the healthcare space. When it came to retail pharmacies, he stated (emphasis added):

> On the pharmacy side, we have deep relationships with all of the big pharmacies out there, so, some examples of that are that we ran ads in the fall that folks might have seen in collaboration with CVS, that were shot in CVS stores. Obviously, you don't do that unless CVS likes you. We brought Rite Aid onto our Gold platform, our subscription platform. Walmart's running videos for their pharmacists on how to take GoodRx, how to accept GoodRx, which they pay for because they really value the GoodRx users coming into Walmart stores and filling up their basket with a whole bunch of other things. And entities like Costco and we work together on integrations to make the GoodRx flows easier for pharmacists there too, so we feel like ***our relationships with all the big pharmacies, which is where all the volume flows through, are really strong.***

89. The statements identified in Paragraph 88 were materially false and misleading when made because: (a) the Company did not subjectively feel that its relationships with "all the big pharmacies" were "really strong" and in fact were internally discussing rejections by Kroger of consumers attempting to use GoodRx codes; (b) the statements omitted that the Company had not secured contracts with its largest and most important pharmacies, including Kroger, requiring that GoodRx codes would be accepted; and (c) the statements omitted that the referenced pharmacies were far less important to GoodRx than Kroger, to which the Company was substantially and intentionally overexposed and often placed at the top of its comparisons because GoodRx made more money from Kroger, and as a result relied on Kroger prescriptions for nearly a quarter of its Prescription Transactions Revenue, a unique concentration risk that was not disclosed.

## VII. The Truth Is Gradually Revealed Through Three Partial Disclosures

90. Investors first learned about a "grocer issue" on the Company's earnings call on May 9, 2022, to discuss the results for the fiscal quarter ending March 31, 2022. On that call, GoodRx first disclosed that "a grocery chain had taken actions late in the first quarter of 2022 that impacted acceptance of discounted pricing for a subset of drugs from PBMs." Analysts and investors understood this to mean that Kroger had begun to reject GoodRx codes.

91. The Company further explained that this decision was "expected to have an adverse impact on prescription transactions revenue in the future that may be material" and "could have an estimated revenue impact of roughly $30 million" in the second quarter of 2022, requiring GoodRx to admit it "expect[ed] Q2 2022 revenue to come in at about $190 million."

92. GoodRx also acknowledged that, as a result, "it is unlikely we will be able to achieve the FY 2022 guidance we provided on our fourth quarter earnings call" and "will not be providing full year expectations at this time as the full year impact of the grocer issue is difficult to estimate."

93. Even worse, the Company admitted that while the grocer represented less than 5% of all pharmacies in the GoodRx network by store count, it had so over-promoted that single chain that it made up almost a quarter of all Prescription Transactions Revenue. During the earnings call, the Company attempted to explain how the situation arose, stating that the grocer was "over indexing relative to market share" "because [of their] particularly attractive PBM-negotiated pricing" for consumers (and adverse to Kroger, just as FE1 stated was internally known). When asked by an analyst whether the best way to "understand this dispute as this grocer just blew up all of their contracts [with PBMs] all at once," Defendant Voermann stated that "that is a reasonably accurate characterization of the situation."

94. While the Company refused to name the grocer in the earnings call, analysts who followed GoodRx quickly concluded that the grocer was in fact Kroger.

95. As a result of these disclosures, GoodRx's common stock plummeted $2.78 per share, or 25.9%, from a close of $10.75 per share on May 9, 2022, to close at $7.97 per share on May 10, 2022. To stem a further decline in stock price, and to maintain a portion of the artificial inflation previously enjoyed, Defendants decided not to disclose the full scope of the problem at that time.

96. On August 8, 2022, as part of an earnings call to announce the Company's results for the second fiscal quarter of 2022, Defendant Bezdek conceded that the impact of GoodRx's failure to secure acceptance at Kroger was greater than the Company earlier indicated. Specifically, he noted that GoodRx saw only a fifth of the weekly volume through Kroger by the end of the quarter compared to the volumes the Company was seeing before the "grocer issue" arose. Put another way, the weekly volume of GoodRx codes processed at Kroger dropped by 80%. Nevertheless, Defendant Bezdek sought to reassure investors and limit the stock drop by stating that "the grocer issue ha[d] been addressed."

97. On an earnings call on November 8, 2022, GoodRx finally revealed the full scope of the impact from its failure to secure acceptance of its codes at Kroger, revealing that it expected "a combined $45 million to $50 million estimated impact to prescription transactions revenue related to the previously disclosed grocer issue and our continued consumer engagement efforts" in the fourth fiscal quarter of 2022. Defendant Bezdek further noted that the "amount of prescription transactions revenue associated with the grocer decreased from $12.4 million to $4.3 million during th[e] period and [wa]s still well under the $33.7 million from third quarter 2021."

98. In a further admission of the prior lack of contracts it concealed from investors, the Company promised it would "selectively direct[ly] contract[] with pharmacies," "including many of the largest chains." The new strategy (a "hybrid model") would "ensure network stability," something investors were not told was previously absent and the absence of which was concealed by Defendants' Class Period misrepresentations.

99. As a result of these final revelations, the price of GoodRx common stock declined an additional $1.18 per share, or 22.5%, from a close of $5.24 per share on November 8, 2022, to close at $4.06 per share on November 9, 2022.

100. FE5, a Vice President of Business Development for GoodRx from February 2022 to January 2023, who reported to VP Greg Hanna, who in turn reported to Chief Revenue Officer Aaron Crittenden, who reported to Defendants Hirsch and Bezdek, confirmed that the Company began direct contracting with retail pharmacies, including Walgreens, CVS, and ultimately Kroger, to avoid a repeat of the grocer issue. FE5 also explained that GoodRx's Prescription Transactions Revenue was driven by the fees it shared with PBMs for driving volume to retail pharmacies.

## ADDITIONAL SCIENTER ALLEGATIONS

101. Several facts demonstrate that Defendants knowingly made false statements or, at a minimum, acted with reckless disregard for the truth or falsity of their Class Period representations to investors.

102. First, Defendants had actual knowledge of and access to information contradicting their public statements to investors. Defendants claimed to have actual knowledge of and access to information about GoodRx's contracts with industry participants, relationships with pharmacies (including Kroger), and the composition of its Prescription Transactions Revenue, including the over-indexing thereof to Kroger. For example, at the RBC Capital Markets Global TIMT Virtual Conference, Defendant Hirsch boasted that GoodRx was "hav[ing] ongoing discussions with pharmacies" and "talking almost daily with" them. On June 17, 2021, during the Cowen Insights/Future Health Conference, Defendant Hirsch trumpeted that: "what we've established over 10 years [in the industry] is incredible relationships and contracts with all the key stakeholders in healthcare."

103. Further, information from FE2 demonstrates that GoodRx was a data-driven organization that was able to, and did, track pharmacy-level claims data in near-real time—only on a day or two delay. Individual Defendants could obtain this

information via daily reports and were directly provided monthly summary reports that contained claims data on a granular scale, including on a pharmacy-by-pharmacy basis. FE3 similarly confirmed that the Company collected this granular, pharmacy-level claims data daily and that he and other executives were able to access it at any time. FE2 also confirmed that Defendants Hirsch and Bezdek held monthly all-hands meetings to discuss, among other things, these developments.

104. Second, Defendants' own statements show that they were closely informed on relationships between the Company and pharmacies and PBM, including Kroger. For example, during an earnings call on November 12, 2020, Defendant Bezdek noted that "[w]e continue to have strong relationships with our pharmacy and PBM partners and have recently launched an additional PBM on our platform." He further noted that the Company had also closed "a multi-year extension of our relationship" "for Kroger" and was "very excited to continue this fruitful relationship with Kroger." Later, on an earnings call on March 11, 2021, Defendant Bezdek discussed the Company's relationship with Kroger again and explained that the Company "continue[s] to collaborate with [its] pharmacy and PBM partners to find more opportunities" to create value for users. During an earnings call on May 13, 2021, in response to an analyst's question regarding potential competition from other services, Defendant Bezdek boasted that "I'd say through our relationships with pharmacies, we continue to work even more closely with pharmacy partners and PBMs. The major pharmacies who are primary partners as well as sort of grocers and smaller chains, we're working on programs with all of them to innovate and improve sort of various offering[s]."

105. FE4 corroborated Defendants' access to this information. FE4 noted that the Kroger Savings Club agreement did not require Kroger to accept GoodRx codes, and that Kroger was known at the Company as the retail group that brought in the most money to GoodRx. In addition, FE3 explained that FE3's boss, who reported directly to Defendants Hirsch and Bezdek, told FE3 that GoodRx lacked direct contracts with retail pharmacies. FE1 also corroborated that Kroger was emphasized in the price

comparison charts with top placement because prescriptions at Kroger brought GoodRx more money than prescriptions elsewhere.

106. Third, the core operations doctrine bolsters the inference of scienter. GoodRx's failure to secure acceptance at Kroger involved the business line that accounted for the overwhelming majority of GoodRx revenue, and Kroger was by far the most significant pharmacy contributing to that revenue.

107. Fourth, Defendants gained inside access to knowledge about Kroger's pharmaceutical operations not only from their claimed close relationship, but also by hiring Kroger pharmaceutical executives including Leanne Kent and Frannie McGowan.

108. Fifth, Defendants had motive to conceal their failure to secure acceptance at Kroger, as admitting that would threaten to end the windfall they made from the excess spread GoodRx earned on Kroger prescriptions.

## CLASS ACTION ALLEGATIONS

109. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the Company's common stock during the Class Period, and were damaged upon the revelation of the alleged corrective disclosures or materialization of the concealed risks. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

110. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GoodRx securities actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Further, during the Class Period, weekly trading volume averaged over 11 million

shares, with 86 million shares outstanding. The high average trading volume and weekly turnover creates a strong presumption in favor of market efficiency. Record owners and other members of the Class may be identified from records maintained by GoodRx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

111. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the same wrongful conduct by Defendants in violation of federal law that is complained of herein.

112. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

113. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether Defendants violated the federal securities laws through their acts as alleged herein;
- Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of GoodRx;
- Whether the Individual Defendants caused GoodRx to issue false and materially misleading statements during the Class Period;
- Whether the Individual Defendants were control persons of the Company;
- Whether Defendants acted knowingly or recklessly in making false and misleading statements;
- Whether the prices of GoodRx securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- Whether the members of the Class sustained damages and, if so, what is the proper measure of damages.

114. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

115. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- The omissions and misrepresentations of fact were material;
- GoodRx securities traded in an efficient market;
- The Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- The Company traded on the NASDAQ and was covered by multiple analysts;
- The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Lead Plaintiff and members of the Class purchased, acquired, and/or sold GoodRx securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

116. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

117. Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens*

*of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as fully described above.

## CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

118. Lead Plaintiff incorporates by reference the allegations in the preceding paragraphs.

119. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

120. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connect with the purchase and sale of GoodRx securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of GoodRx securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire GoodRx securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

121. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or

issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for GoodRx securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about GoodRx's inability to ensure that GoodRx codes would be accepted in its purported network and GoodRx's over-reliance on a single pharmacy chain, Kroger.

122. By virtue of their responsibilities at GoodRx, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

123. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of GoodRx's internal affairs.

124. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their day-to-day control and authority over GoodRx, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As senior officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to GoodRx's business, operations, future

financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for GoodRx securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning GoodRx's business and financial condition which were concealed by Defendants, Lead Plaintiff and other members of the Class purchased or otherwise acquired GoodRx securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for securities and/or upon statements disseminated by Defendants, and were damaged thereby.

125. During the Class Period, GoodRx securities were traded on an active and efficient market. Lead Plaintiff and other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired GoodRx securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases by Lead Plaintiff and the Class, the true value of GoodRx was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of GoodRx securities declined sharply upon public disclosures of the facts alleged herein, and/or materialization of the risks concealed by Class Period misrepresentations and omissions, to the injury of Lead Plaintiff and Class members.

126. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

127. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the

Class Period, upon the disclosure that the Company had not secured the acceptance of GoodRx codes with Kroger or other major retail pharmaceutical chains, and, as a result, was exposed to Kroger deciding not to accept those codes which occurred in Spring 2022, and that GoodRx was massively over-indexed to Kroger, a unique concentration risk it concealed from investors.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act Against All Defendants**

128. Lead Plaintiff incorporates by reference the allegations in the preceding paragraphs.

129. During the Class Period, the Individual Defendants participated in the day-to-day operation and management of GoodRx, and conducted and participated directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions and responsibilities, they knew the adverse non-public information about GoodRx's over-index on a single pharmacy chain and the Company's lack of direct contracts with retail pharmacies to ensure the acceptance of GoodRx codes.

130. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to GoodRx's business and prospects, and to correct promptly any public statements issued by GoodRx which were false or misleading.

131. Because of their positions of control and authority as senior officers, which they exercised in carrying out their day-to-day responsibilities, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which GoodRx disseminated in the marketplace during the Class Period concerning GoodRx's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause GoodRx to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of GoodRx within the meaning of Section 20(a)

of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GoodRx securities.

132. Each of the Individual Defendants, therefore, acted as a controlling person of GoodRx. Each had the power to direct the actions of, and exercised the same to cause, GoodRx to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of GoodRx and possessed the power to control the specific activities which compromise the primary violations about which Lead Plaintiff and the other members of the Class complain.

133. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GoodRx.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action under Federal Rule of Civil Procedure 23;

b. Awarding compensatory damages and equitable relief in favor of Lead Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Lead Plaintiff hereby demands a trial by jury.

Dated: September 20, 2024

Respectfully submitted,

*By: /s/ Joshua B. Silverman*

**POMERANTZ LLP**

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

Joshua B. Silverman (admitted *pro hac vice*)
Diego J. Martinez-Krippner (*pro hac vice* application forthcoming)
10 S. LaSalle Street, Suite 3505
Chicago, IL 60603
Tel: (312) 377-1181
jbsilverman@pomlaw.com
dmartinezk@pomlaw.com

*Counsel for the Kalmanson Family and Lead Counsel for the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

Peretz Bronstein
(*pro hac vice* application forthcoming)
Eitan Kimelman
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
peretz@bgandg.com
eitank@bgandg.com

*Additional Counsel for The Kalmanson Family*